## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**CLARK BARTHOLOMERE WILSON,**
         **Petitioner,**

**v.**                                              **Case No.  3:03cv566/MCR/MD**

**JAMES V. CROSBY,**
         **Respondent.**
_____

### <u>REPORT AND RECOMMENDATION</u>

**Before the court is an amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 22).  Respondent has filed a response (doc. 26) to which petitioner has replied (doc. 32).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.**

## BACKGROUND and PROCEDURAL HISTORY[1]

Petitioner murdered Betty Horne on April 6, 1997 on State Road 97 ("Highway 97") in Escambia County, Florida.  He knew that Ms. Horne would drive south on Highway 97 from her home in the Atmore community, just north of the Alabama/Florida line.  He waited along the road until she passed in her van, pulled alongside her as if to pass her, and shot her full in the face with his shotgun.

Evidence produced at trial was largely circumstantial.  In March of 1992 Ms. Horne and petitioner began what developed into a very turbulent relationship, but Ms. Horne ended the relationship in December 1996 (ex. S, p. 155).[2]  Petitioner was very possessive of Ms. Horne and had a history of stalking and threatening her.  Ms. Horne went out of her way to avoid petitioner and refused to tell him where she worked.  In February of 1992, Ms. Horne's granddaughter and her aunt found Ms. Horne hiding outside her trailer.  She told them that petitioner had a gun and had threatened to kill her.  She filed charges, and after she returned home petitioner kicked in her door and was arrested for stalking.  Ms. Horne later requested that the charges be dropped (*id.*, pp. 270-280, 285-293).  Ms. Horne's daughter testified that on April 3, 1997, her mother told her that petitioner had just called and again threatened to kill her (*id.*, p. 161).  The next day, two days before the murder, Ms. Horne's daughter went to visit her mother at work.  She saw petitioner in his truck in front of Ms. Horne's workplace (*id.*, p. 173).  Ms. Horne worked for Penny Gardner, who lived in Escambia County, Florida.  Ms. Horne lived in a mobile home park just inside the Alabama state line (*id.*, pp. 154-155, 178).  To get from Ms. Horne's home to her employer's Florida home, Ms. Horne had to drive south on Highway 97 (*id.*, pp. 173, 174).

---

[1] The facts stated herein are those presented at trial and viewed in the light most favorable to the prosecution.  Where there are conflicting inferences and disputes exist, this Court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution.  Martin v. State of Alabama, 730 F.2d 721, 724 (11th Cir. 1984).  Although this court is not called on to address directly the sufficiency of the evidence, the evidence presented to the jury plays a part in the court's analysis.

[2] Henceforth all references to exhibits will be to doc. 26 unless otherwise noted.

Jerry Stuckey was traveling south on Highway 97 when he saw an old truck "moving very fast" in the opposite direction headed toward Alabama (*id.*, pp. 421-22). As Mr. Stuckey drove further south near the Davisville school, he saw a van in his lane moving slowly south and wandering to the left into the other lane (*id.*, p. 422). He also passed some glass on the road (*id.*, pp. 422-23).  As he passed the van, he noticed a hole in a window on the passenger's side (*id.*, pp. 423-24).  The van then went into a ditch (*id.*, p. 423).  Mr. Stuckey stopped, and he and another driver approached the van (*id.*, p. 423).  They found Ms. Horne lying in the van with blood scattered throughout (*id.*, pp. 423-24).  Mr. Stuckey was driving a small red car at the time (*id.*, p. 424-25).

Michael Godwin testified that as he was driving north on Highway 97, he saw a van creeping down the road with a young man holding the right door handle (*id.*, p. 656).  He assisted the man in opening the door of the van and discovered Ms. Horne (*id.*, pp. 656-57).  Mr. Godwin then left the scene to locate a law enforcement officer, and found Deputy Ron Dove at his nearby home five minutes later (*id.*, pp. 656, 657).  Mr. Godwin reported the incident at 5:00 p.m. (*id.*, p. 708).  Deputy Dove was the first officer on the scene (*id.*, p. 708).

Dr. Havard performed an autopsy on Ms. Horne (*id.*, pp. 452, 453).  Ms. Horne was killed by a shotgun fired at relatively close range (*id.*, pp. 452-456, 462-463).  The bullet likely contained twelve buckshot pellets (*id.*, p. 445).  Six pellets were recovered from Ms. Horne's body and at least three from the van (*id.*, pp. 445-48, 454, 586).  Dr. Havard testified that Ms. Horne's head was turned almost all the way to the left when she was shot (*id.*, p. 462).

A ballistics expert testified that Ms. Horne was shot at close range, "within a few feet" (*id.*, p. 577, 582).  He also testified that a shotgun emits very little residue, and he would not expect to find residue in petitioner's truck or on his hands or clothing (*id.*, p. 578).  There was no residue on petitioner's clothing (*id.*, pp. 579-580).

The shots were number one buckshot, which are used for hunting deer or larger game (*id.*, pp. 574-575).

When the police searched petitioner's home they found shotguns, including a 12-gauge shotgun, as well as a five-shell box containing five 16-gauge shotgun shells of number one buckshot, with two shells missing (*id.*, 480, 488). Although the police did not find a 16-gauge shotgun in petitioner's home, evidence showed that he had been given his deceased father's 16-gauge shotgun, and he valued the gun (*id.*, 144, 327, 328).

Petitioner testified that he went to Sutton's Café at about 4:00 p.m., paid for his coffee, and left at 4:30 p.m. (*id.*, p. 827, 900-01). It took him approximately ten minutes to get home (*id.*, 900). Once home, he put some clothes from the washing machine into the dryer, then went into the house and retrieved more clothes to put into the washer (*id.*, 827). He then went next door to see when his son was expected home (*id.*, pp. 827). After he had been at his son's house for approximately fifteen minutes, he glanced at this watch and noted that it was 4:57 p.m. (*id.*, p. 928). Petitioner told the police that he had sold the 16-gauge shotgun to a man from Louisiana because he needed the money (*id.*, pp. 847-848, 850-51). He also testified that he has bursitis in his shoulder, and although he could hold his hands straight out in front of him, he could not pick them up when they were at his sides (*id.*, p. 894).

Petitioner admitted that four years prior to the murder he wrote a letter to Ms. Horne in which he told her that he was obsessed with her and felt as though he had lost everything since he "lost" her (*id.*, pp. 902-04). Just one month prior to the murder he sent her a letter in which he stated he was "getting to the point I can't take it anymore" and that he could not stand the thought of her being with another man (*id.*, p. 908-11).

A waitress at Sutton's café testified that petitioner was at the café when the waitress' daughter came in at 4:30 p.m. (*id.*, pp. 765, 770-771). Willard Everett

testified that he saw petitioner at Sutton's having coffee, and saw petitioner leave the café at 4:30 p.m. (*id.*, pp. 662-663). Jason Burkett testified that he lived next door to the petitioner with the petitioner's son (*id.*, p. 738). He told the police that the petitioner had returned home at 4:45 to 5:00 p.m. and had come over to the house five to ten minutes later (*id.*, pp. 742, 743, 748).

Stan Singleton, Ms. Horne's son-in-law, testified that at approximately 11:00 a.m. on the day of the murder he saw petitioner drive by the church Ms. Horne was then attending (*id.*, pp. 218). That same day Joe Bolton left his home around 4 p.m. to go to the grocery (*id.*, pp. 355-56). When he arrived at the store, he saw petitioner sitting in his truck at the edge of the parking lot facing south overlooking Highway 97 (*id.*, p. 349). Mr. Bolton went into the store, and when he came out petitioner was gone (*id.*, p. 349). The store receipt showed Mr. Bolton's purchase was made at 4:30 p.m. (*id.*, p. 352). Mr. Bolton then drove down the road to another grocery (*id.*, p. 349). On the way, he passed petitioner sitting in his truck at the State Line Bar (*id.*, pp. 349-50). Again, the truck was facing south on Highway 97 (*id.*, p. 350). Mr. Bolton went into the grocery and bought something; the receipt showed the purchase was made at 4:48 p.m (*id.*, p. 352). On his way home, Mr. Bolton again saw petitioner sitting in his truck at the State Line Bar, still looking south down the road (*id.*, p. 351).

Jerry Gunn, Trent Milstead, and Wilson Johnson testified that each of them independently saw petitioner sitting in his truck at the State Line Bar between 4:00 and 4:45 p.m. on the day of the murder (*id.*, pp. 399-401, 410, 416-417). Mr. Johnson testified that he saw petitioner finally pull out of the parking lot and drive south down Highway 97 (*id.*, pp. 417-18).

A public defender investigator testified he had photographed three different trucks in the area that were similar to petitioner's and could have been mistaken for petitioner's truck (*id.*, pp. 624-633).

Justin Garret testified that someone asked petitioner if he would sell his shotgun, and petitioner had said he would not take a farm in Georgia for it (*id.*, p. 327).  The gun was a double-barreled side-by-side shotgun, but Mr. Garret did not know the gauge (*id.*, pp. 327-328).

In short, the circumstantial evidence showed, and the jury believed, that petitioner killed Ms. Horne.  He lay in wait for her, and when her van passed on the road he pulled up beside her and shot her in the face as she looked at him.  The jury found petitioner guilty of first degree murder with a weapon, and he was sentenced to life imprisonment without the possibility of parole (ex. A).  His direct appeal was unsuccessful.  He then filed three post-conviction actions in the state courts, all without success.  These latter proceedings will be discussed in detail in the following sections concerning the timeliness of the instant federal petition and in the sections on the merits of petitioner's claims.

## TIMELINESS

Respondent contends that the instant federal habeas petition is untimely. Pursuant to the requirements set forth in 28 U.S.C. § 2244, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L.No. 104-132, 110 Stat. 1214, which became effective on April 24, 1996, a one year period of limitation applies to the filing of habeas petitions by person in custody pursuant to a state court judgment.  The limitation period runs from the latest of:

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    **(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.**

**Section 2244(d)(1).**

    The parties do not dispute that petitioner's one-year filing deadline began to run on April 30, 2002, the date that the time expired for seeking certiorari review of his conviction in the United States Supreme Court (*see* doc. 26, p. 11; doc. 32, p. 5). *Bond v. Moore*, 309 F.3d 770 (11th Cir. 2002).  The issue of whether the instant petition was timely depends upon whether the one-year filing deadline was tolled by a "properly filed" motion for post-conviction relief in the state courts, or pursuant to equitable tolling principles.

    Section 2244(d)(2) provides:

        **The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.**

The United States Supreme Court held that "an application is 'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings."  *Artuz v. Bennett*, 531 U.S. 4, 8, 121 S.Ct. 361, 364, 148 L.Ed.2d 213 (2000).  State laws and rules "usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee."  *Id.* (citations omitted).

    The Supreme Court recently held that time limits are filing conditions.  *Pace v. DiGuglielmo*, 544 U.S. 408, 414, 417, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005).  Thus a post-conviction application that is untimely under state law does not qualify for statutory tolling.  *Id.*; *see also Webster v. Moore*, 199 F.3d 1256, 1258-59 (11th Cir. 2000).  Similarly, a state petition that does not comply with a state rule requiring a written oath is not "properly filed."  *Hurley v. Moore*, 233 F.3d 1295 (11th Cir. 2000).  Although *Hurley* preceded *Bennett*, its validity was not affected by it.  *See Drew v. Dep't of Corrections*, 297 F.3d 1278, 1285 (11th Cir. 2002).

The Eleventh Circuit recently considered another instance in which a motion is not properly filed -- "when a motion is filed in a court that lacks jurisdiction to hear it." *Estes v. Chapman*, 382 F.3d 1237, 1239 (11th Cir. 2004).  The *Estes* court noted that *Bennett* had left that possibility open, albeit in *dicta*: "If, for example, an application is erroneously accepted by the clerk of a court lacking jurisdiction . . . it will be pending, but not properly filed." *Estes*, 382 F.3d at 1239 (quoting *Bennett*, 531 U.S. at 9, 121 S.Ct. at 364).  The *Estes* court concluded that, contrary to the state's argument, the Georgia Supreme Court, where Mr. Estes' application was filed, had jurisdiction, so the limitation period was tolled.  Nevertheless, it appears to be settled that if a petitioner's post-conviction filing is filed in a court that lacks subject matter jurisdiction, the limitation period would not be tolled.

On the other hand, a state court's determination that an application for post-conviction relief is subject to a state procedural bar does not render the application "improperly filed," since "[o]nly individual claims, and not the application containing those claims, can be procedurally defaulted under state law . . ." *Bennett*, 531 U.S. at 8.  Additionally, a state post-conviction challenge dismissed because it was brought pursuant to the "wrong statutory vehicle" was "properly filed" within the meaning of § 2244(d)(2). *Delancy v. Fla. Dep't of Corrections,* 246 F.3d 1328 (11th Cir. 2001).  In *Delancy*, the Eleventh Circuit applied *Bennett* in holding that Mr. Delancy had filed a post-conviction challenge to his consecutive sentences with the state trial court, pursuant to Florida Rule of Criminal Procedure 3.800, but the state court dismissed the motion on the ground that the claims raised therein should have been brought in a Rule 3.850 motion filed in the same state court. *Id.* at 1330.  The Eleventh Circuit, following the reasoning of *Bennett*, distinguished the question "whether an application has been 'properly filed' . . . from the question whether the claims contained in the application are meritorious and free of procedural bar." *Id.* The court determined that the district court erred in "looking beyond the face of Delancy's Rule 3.800 motion to consider the individual claims (i.e., whether they are

challenges to consecutive sentences or to illegal sentences)," and concluded that the Rule 3.800 motion was "properly filed" because it, "on its face, met state procedural and filing requirements." *Id.* at 1330-31.

Finally, a state post-conviction motion that was denied as successive was "properly filed" for AEDPA tolling purposes. *Weekley v. Moore*, 244 F.3d 874 (11th Cir. 2001).

Petitioner's post-conviction filings will be considered in light of the foregoing precedent. Petitioner filed three separate actions in the state courts, and he relies on one or more of these actions as being "properly filed" in order to toll the statutory limitation.

1.    "Notice to Invoke Discretionary Jurisdiction" - Florida Supreme Court

On April 17, 2002, petitioner filed a petition in the Florida Supreme Court requesting that the court exercise its discretionary jurisdiction to review a claim that was raised in his direct appeal and rejected by the appellate court, specifically, that he was denied due process when he was arrested in Alabama by Florida law enforcement authorities and not properly extradited (ex. I).

On May 10, 2002, the supreme court dismissed the petition, stating: "It appearing to the Court that it is without jurisdiction, the Petition for Review is hereby dismissed  See Jenkins v. State, 385 So. 2d 1356 (Fla. 1980)."[3] (ex. J).  Pursuant to *Bennett* and *Estes*, this court concludes that because the Florida Supreme Court lacked jurisdiction to consider the matter, petitioner's Notice to Invoke Discretionary Jurisdiction did not toll the statutory limitation period.

2.    Petition for Writ of Habeas Corpus for Belated Appeal - First District Court of Appeal of Florida

On June 13, 2002, which was 44 days after the commencement of the limitation period, petitioner filed a habeas petition in the First District Court of

---

[3]In *Jenkins*, the Florida Supreme Court of Florida held that it lacked jurisdiction to review per curiam decisions of the several district courts of appeal rendered without opinion, regardless of whether they are accompanied by a dissenting or concurring opinion, when the basis for such review is an alleged conflict of that decision with a decision of another district court of appeal or of the supreme court.  385 So.2d at 1359.

Appeal of Florida (First DCA) (ex. E).  In his petition he again contended that he was unlawfully arrested in Alabama by Florida law enforcement, and denied his right to a proper extradition proceeding.  On August 7, 2002 the First DCA denied relief without opinion (ex. F, p. 1).  Petitioner then filed a timely motion for rehearing advancing the same argument (ex. G).  The motion for rehearing was denied on July 11, 2003 with the mandate issuing July 18, 2003 (ex. H).[4]  The one year limitation period would ordinarily have expired on April 30, 2003, so if the habeas petition in the First DCA was "properly filed," the limitation period was tolled until July 18, 2003; if it was not properly filed, the limitation period expired on April 30, 2003, and petitioner's original federal petition, filed December 15, 2003, is untimely.

Respondent contends that the state habeas petition was not properly filed because the First DCA lacked jurisdiction to consider it.  Florida law vests the state supreme court, district courts of appeal, and circuit courts with concurrent original jurisdiction to issue writs of habeas corpus.  Fla. Const. art. V, § § 3(b)(9), 4(b)(3), 5(b); Fla. Stat. § 79.01; Fla.R.App.P. 9.030.  Florida law further provides:

> Before a circuit judge the petition and the papers shall be filed with the clerk of the circuit court of the county in which the prisoner is detained. Before the other courts, justices or judges, the papers shall be filed with the clerk of the court on which the justice or judge sits.

Fla. Stat. § 79.09.  Respondent here does not contest that the habeas petition met the general filing requirements in the First DCA.  Petitioner followed the state law filing requirements by delivering his petition to the location prescribed by statute, namely, the district court of appeal of the district in which he was being detained.  *See* Fla. Stat. § 79.09.  However, respondent contends that the First DCA lacked jurisdiction to consider the petition, because the proper method for seeking post-conviction relief is to file a motion pursuant to Fla.R.Crim.P. 3.850 in the circuit court in which petitioner was convicted.  Respondent relies on *Baker v. State*, 878 So.2d 1236 (Fla.

---

[4]As respondent notes, he no longer has a copy of the order denying the motion for rehearing.  However, the First DCA's docket shows that the motion was denied as respondent contends, on July 11 with the mandate issuing on July 18.  *See* http://199.242.69.70/pls/ds/ds_docket.

2004) to explain "the interplay between habeas corpus and Rule 3.850 . . . ." (doc. 26, p. 13). Respondent's reliance upon *Baker* is misplaced. First, *Baker* post-dated petitioner's attempts to obtain habeas relief, and announced a prospective rule, so it would not be directly applicable to his petition. Second, the *Baker* decision does not support the merits of respondent's position.

In *Baker* the Florida Supreme Court consolidated a number of pending petitions seeking habeas relief to determine the appropriate procedure for handling those and similar petitions. The court noted that in the past it had "transfer[red] such petitions to the lower courts for consideration as motions for post-conviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850," but that this was not the proper procedure. 878 So.2d at 1238. The court noted that Rule 3.850 affords the proper vehicle for post-conviction relief and that "[t]he remedy of habeas corpus is not available in Florida to obtain the kind of collateral post-conviction relief available by motion in the sentencing court pursuant to rule 3.850." *Id.* at 1245. It further noted that its prior practice of denying petitions instead of transferring them to the appropriate court had "inadvertently encouraged prisoners to file their collateral post-conviction challenges to their noncapital criminal judgments of conviction and sentence directly in this Court, because our denials of such petitions have given prisoners the false hope that we might one day grant some of them relief." *Id.* The court therefore concluded that in the case before it, and in future cases, it would dismiss "as unauthorized" those petitions that should properly have been filed as motions pursuant to Rule 3.850. *Id.* Based on the court's reasoning and decision in *Baker*, respondent here contends:

> if Rule 3.850 is applicable, then habeas corpus relief [in the First DCA] is <u>not available</u>. In short, if Rule 3.850 is applicable, then a court of appeal is without jurisdiction to consider a habeas petition.

(Doc. 26, p. 14) (emphasis in original).

This court does not agree with respondent's leap from unavailability to lack of jurisdiction, at least within the guidance of *Bennett*. It is true that the proper

vehicle for this petitioner to have sought relief was a Rule 3.850 motion, but that does not mean that the First DCA lacked jurisdiction. Indeed, the *Baker* court was careful not to say that it lacked jurisdiction, only that filing a habeas petition in these circumstances is unauthorized. While this may seem like a distinction without a difference, the distinction is real. In a concurring opinion, Chief Justice Anstead noted that while the Florida Supreme Court was attempting "to efficiently regulate a system for addressing post-conviction claims[,]" the court still had jurisdiction to consider habeas petitions, and would continue to "remain alert to claims of manifest injustice . . . ." 878 So.2d at 1246.

As noted above, the Florida Constitution and statutes give the supreme court, the district courts of appeal, and the circuit courts, and their individual justices and judges, the power to issue the writ. Indeed, the *Baker* court noted that in the past it had often transferred habeas petitions to the appropriate lower courts for consideration as motions filed pursuant to Rule 3.850. Had the First DCA done that in the instant case, there is no question that the post-conviction application would have been "properly filed," according to *Delancy*. The *Baker* court further noted that it had in the past denied such petitions "on the merits." 878 So.2d at 1238. Clearly, if the court previously denied habeas petitions "on the merits" when those petitions should have been filed as Rule 3.850 motions, the court had the power, and therefore the jurisdiction, to do so. The converse must also be true, because it would defy logic for the Florida Supreme Court to say that it had jurisdiction to deny habeas petitions on the merits, but lacked jurisdiction to grant such petitions on the merits.

The true thrust of the *Baker* decision is that the state court system will be more efficient if prisoners are required to file a Rule 3.850 motion when such a motion is authorized, instead of seeking habeas relief. Indeed this is akin to a ruling that a habeas petition filed in the supreme court or a court of appeal was brought pursuant to the wrong vehicle rather than a jurisdictional determination. The situation described in *Baker* is not the absence of jurisdiction contemplated in

*Bennett,* because the *Bennett* Court was very specific. "An application is 'filed' . . . when it is delivered to, and accepted by, the appropriate court officer . . . ." 531 U.S. at 8, 121 S.Ct. at 363. "And an application is '*properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings . . . ." *Id.*, 121 S.Ct. at 364 (emphasis in original). Examples are "the form of the document, the time limits upon its delivery, *the court and office in which it must be lodged*, and the requisite filing fee." *Id.* (Footnote omitted, emphasis added). The court suggested two exceptions: filing in a court that lacks jurisdiction, or failing to pay the filing fee. *Id.* But the court placed particular emphasis on the distinction between "claims" and "applications." It held that a claim may be procedurally barred, and therefore relief might not be available under the application, but the procedural bar did not negate the fact that the application was properly filed. The determinative question here is whether the applicable state rule "set[s] forth a condition to filing, as opposed to a condition to obtaining relief." *Bennett*, 531 U.S. at 11, 121 S.Ct. at 365. The undersigned concludes that the rule announced in *Baker* was a condition for obtaining relief in a habeas petition, not a rule concerning a condition to filing one. In the instant case, petitioner properly filed his habeas petition with the First DCA. He could not get relief on his claim, but there was no infirmity in his filing.

For the foregoing reasons, this court finds that the petition for writ of habeas corpus filed in the First DCA on June 13, 2002 was "properly filed" within the meaning of the AEDPA, and the limitation period was tolled until the court issued its order and mandate denying petitioner's motion for rehearing on July 18, 2003. Therefore, as of that date, only 44 untolled days (April 30 to June 13, 2002) had elapsed.

3.   <u>Petition for Writ of Habeas Corpus for Belated Appeal - First District Court of Appeal of Florida</u>

On August 7, 2003, which was 20 days after the denial of his first habeas petition became final, petitioner filed a second habeas petition in the First DCA,

making the same argument he had made earlier in the same court (ex. K).  That petition was denied without opinion on September 22, 2003 (ex. L), and a timely motion for rehearing was denied on November 24, 2003, with the mandate issuing December 8, 2003 (ex. F, p. 2; http://199.242.69.70/pls/ds/ds_docket).  Although this second petition was clearly successive and therefore procedurally barred, it was, like the first petition and for same reasons, "properly filed" within the meaning of the AEDPA.  As noted above, the fact that an application for post-conviction relief is subject to a state procedural bar does not render the application "improperly filed," since "[o]nly individual claims, and not the application containing those claims, can be procedurally defaulted under state law . . . ."  *Bennett*, 531 U.S. at 8, 121 S.Ct. at 364.  Therefore, the limitation period did not begin to run again until December 8, 2003, at which time 64 days (44 + 20) had run.  Seven days later, on December 15, 2003, petitioner filed his original federal petition.  As of that date only 71 days of the federal limitation period had run.  The original federal petition is therefore timely.

That does not quite end the timeliness discussion however.  The next issue is whether petitioner's amended federal petition (doc. 22), filed on February 26, 2006, was timely.  Although respondent is correct that all but one of the claims raised in the amended petition do not "relate back" to the claim raised in the original petition, all of the claims raised in the amended petition may be considered by this court if the amended petition was filed within the one-year limitation period.

As discussed above, 64 days of the limitation period had elapsed as of December 8, 2003.  Although the filing of the original federal petition on December 15, 2003, did not toll the limitation period for the amended petition, *see Duncan v. Walker*, 533 U.S. 167, 181, 121 S.Ct. 2120, 2129, 150 L.Ed.2d 251 (2001), petitioner was entitled to statutory tolling from January 4, 2004 to July 22, 2005, during the pendency of a Rule 3.850 proceeding he initiated in the state court while his original federal petition was pending.

Petitioner filed his Rule 3.850 motion in the appropriate state circuit court on January 4, 2004 (ex. O). In his motion he raised six grounds of ineffective assistance of counsel (doc. 32, ex. H).[5] All grounds were considered on the merits and denied based on reasons that will be discussed in detail below (ex. P). Petitioner's timely appeal was denied by the First DCA on May 23, 2005 with the mandate issuing on July 22, 2005 (ex. R). Because the Rule 3.850 motion met all appropriate filing requirements, and the Rule 3.850 court addressed all grounds on their merits, the Rule 3.850 motion was "properly filed," and the limitation period was tolled while the motion was pending. Petitioner's amended federal petition was filed 199 days later, on February 6, 2006.

This court has already determined that as of December 8, 2003, petitioner had used 64 days of the 365 days allowed. From December 8, 2003 until January 4, 2004 when he filed his Rule 3.850 motion, another 27 days elapsed, making a total of 91 days. Those days added to the 199 that elapsed between the final denial of petitioner's Rule 3.850 motion on appeal and the filing of the amended petition here total 290 days. Thus, the amended petition was filed within the one-year limitation period. In light of this conclusion, the question of whether the claims raised in the amended petition relate back to the original petition is irrelevant. Accordingly, the court determines that all grounds raised herein are timely and will be considered by the court.

## STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state

---

[5]Respondent has not favored this court with a complete copy of the Rule 3.850 motion, but petitioner provided a copy with his reply (doc. 32).

court decisions under § 2254 as brought about by the Anti-Terrorism and Effective
Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.
In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved
>> an unreasonable application of, clearly established
>> Federal law, as determined by the Supreme Court of the
>> United States; or
>> (2) resulted in a decision that was based on an
>> unreasonable determination of the facts in light of the
>> evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review
in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  The
appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal
> habeas court to grant a state prisoner's application for a writ of habeas
> corpus with respect to claims adjudicated on the merits in state court.
> Under § 2254(d)(1), the writ may issue only if one of the following two
> conditions is satisfied - the state court adjudication resulted in a
> decision that (1) "was contrary to . . . clearly established Federal law,
> as determined by the Supreme Court of the United States," or (2)
> "involved an unreasonable application of . . . clearly established
> Federal law, as determined by the Supreme Court of the United States."
> Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached
> by this court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable
> facts.  Under the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies the correct
> governing legal principle from this Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

120 S.Ct. at 1523 (O'Connor, J., concurring).  Under the test just described a habeas
court does not examine the State court's ruling to see if it is correct, but examines

it only to see if it is reasonable.  More recently, in *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Id.*, 123 S.Ct. 1172.   The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer,* 123 S.Ct. at 1173 (quoting *Williams v. Taylor*, 529 U.S. at 405-06, 120 S.Ct. at 1519-20).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases--indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams*, 529 U.S. at 405-06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application

inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 649, 652, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001); *see also Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004) (A state court decision involves an unreasonable application of clearly established Federal law if the State court decision "identifies the correct governing Supreme Court legal principle . . . but . . . 'refuses to extend the governing principle to a context in which the principle should have controlled.'" (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000))).

Section 2254(d)(1) requires more than mere error, and more even than clear error on the part of the State court before federal habeas relief may be issued.  *E.g., Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) ("We may not grant respondent's habeas petition, however, if the state court simply erred. . . ."); *Lockyer, supra*, 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Early v. Packer*, 537 U.S. at 11, 123 S.Ct. at 366 (State court "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law. . . ."); *Williams, supra*,

529 U.S. at 410-12, 120 S.Ct. at 1522-23 (The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion.").

Only if the federal habeas court finds the State court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims. *Neelley*, 138 F.3d 917. Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides for a "highly deferential standard of review" for factual determinations made by a state court); *Jackson*, 112 F.3d at 824-25 (noting that the new statute places a heavier burden on petitioner to overcome the presumption of factual correctness).

## PETITIONER'S GROUNDS FOR RELIEF

**Six of petitioner's seven grounds for relief are based on claimed ineffective assistance of trial counsel.  Respondent contends that the six ineffective assistance of counsel claims are procedurally defaulted because they were not fairly presented to the state court as federal claims.  It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[6] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  *Duncan*, *supra*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Picard*, 404 U.S. at 277-78.**

**The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In *Picard v. Connor*, *supra*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the**

---

[6]  Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

    (A)  the applicant has exhausted the remedies available in the courts of the State; or

    (B) (i)  there is an absence of available State corrective process; or

        (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.

. . . .

(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

petitioner to relief.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.* at 278, 92 S.Ct. at 513, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* 459 U.S. at 7, 103 S.Ct. at 278 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)).  The only manner in which the habeas petitioner had cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  *Anderson*, 459 U.S. at 7, 103 S.Ct. at 278 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  459 U.S. at 7 and n. 3, 103 S.Ct. at 278 and n. 3.

Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find

material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 1351, 158 L.Ed.2d 64 (2004). The *Baldwin* Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* This language, while not part of the Court's holding, provides an instructive and useful rule of thumb.

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734. This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991). However, a petitioner may obtain federal review of his claim if the state procedural rule is applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S.Ct. 850, 858, 112 L.Ed.2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas

court to reach the merits of a claim. *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. *Tower v. Phillips, supra.* To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Here respondent argues that petitioner's six ineffective assistance of counsel claims "may not be exhausted" because there were not presented to the state court as federal claims (doc. 26, p. 23). Respondent notes that petitioner did not cite to *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) in his Rule 3.850 motion, but simply argued that his counsel was ineffective in each instance and concluded that his "Constitutional rights were violated under the 6th and 14th amendments of the United States Constitution." (*Id.*; doc. 32, ex. H). Respondent says this is not enough. He attempts to distinguish *Baldwin v. Reese, supra*, by noting that the *Baldwin* Court's statement that such a reference may be sufficient is mere *dicta*. Respondent is wrong for two reasons. First, the Rule 3.850

court clearly recognized the ineffective assistance of counsel claims as federal claims because it cited to *Strickland* in its order denying them (ex. P.).  Moreover, as this court noted earlier, while the *Baldwin* Court's examples are *dicta*, they provide an instructive and useful rule of thumb.  Furthermore, as the Eleventh Circuit recently noted, "there is *dicta* and then there is *dicta*, and then there is Supreme Court *dicta.*  This is not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of *dicta*.  It is well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court . . . ."  *Schwab v. Crosby*, __ F.3d __, 2006 WL 1642757, at *17 (11th Cir. June 15, 2006).  In the instant case, petitioner's federal ineffective assistance of counsel claims were fairly presented to the state court. Therefore, all such claims will be reviewed on the merits.

As to the law applicable to those claims, Supreme Court law is well settled. In order to prevail upon a claim of ineffective assistance of counsel, petitioner must prove that:   (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for  counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"The purpose of ineffectiveness review is not to grade counsel's performance."  *Chandler*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*).  In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.  *Id.* at 1314.  "Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.), *cert. denied*, 513 U.S. 899, 115 S.Ct. 255, 130 L.Ed.2d 175 (1994). In evaluating the reasonableness of counsel's actions, a court must make "every effort . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's

performance "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. As the Eleventh Circuit has emphasized:

> We must avoid second-guessing counsel's performance: "[I]t does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance." *Waters* [*v. Thomas*, 46 F.3d 1506], 1522 (en banc). Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.

*Chandler* at 1314 (footnote omitted). Furthermore, an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation. Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment. *Chandler* at 1314 n.15.

Moreover, "[c]ounsel will not be deemed unconstitutionally deficient because of tactical decisions." *McNeal v. Wainwright*, 722 F.2d 674, 676 (11th Cir. 1984) (citations omitted); *Crawford*, 311 F.3d at 1312 ("Deliberate choices of trial strategy and tactics are within the province of trial counsel after consultation with his client. In this regard, this court will not substitute its judgment for that of trial counsel.") (quotation marks, internal alteration, and citation omitted). There is a strong presumption that counsel's performance was reasonable and adequate, with great deference being shown to choices dictated by reasonable strategy. *Rogers*, 13 F.3d at 386; *see also Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004), *cert. denied*, 474 U.S. 1038-, 125 S.Ct. 1703, 161 L.Ed.2d 531 (2005). "[T]here are no 'absolute rules' dictating what reasonable performance is or what line of defense must be asserted." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence -- which is also constitutionally protected -- and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

"In general, defense counsel renders ineffective assistance when [he] fails to investigate adequately the sole strategy for a defense or to prepare evidence to support that defense." *Fortenberry v. Haley*, 297 F.3d 1213, 1226 (11th Cir. 2002). Counsel's duty to investigate "requires that counsel 'conduct a substantial investigation into any of his client's plausible lines of defense.'" *Id.* (citation omitted).

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. *Chandler*, 218 F.3d at 1314 n.14 (citing *Waters v. Thomas*, 46 F.3d 1506, 1512, 1518-19 (11th Cir. 1995) (en banc)). "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Waters*, 46 F.3d at 1514. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978).

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S.Ct. at 2067. Instead, petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. at 2068. Without support in the record, bare allegations that petitioner was prejudiced by counsel's performance are not sufficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

1.    Ineffective assistance of counsel - failure to challenge impossibility of events.

As his first claim, Petitioner contends that his trial counsel did not argue to the jury the impossibility of his having committed the murder, based largely on petitioner's construction of the angle from which he would have been shooting from a moving truck into another moving vehicle (doc. 22, pp. 4, 4a-4c).  In his reply, petitioner speculates that if counsel had hired an "expert" on trajectories, the conclusions of the medical examiner (who testified that the victim was shot full in the face and neck, with her head turned to the left as if looking out her driver's side window) could have been refuted (doc. 32, p. 11)

In the state court's written decision denying petitioner's Rule 3.850 motion, the court specifically cited *Strickland* as providing the legal standard applicable to petitioner's ineffective assistance of counsel claims (ex. P, p. 72).  Because the state court explicitly identified and applied the two-prong *Strickland* standard, petitioner is entitled to federal habeas relief only if he establishes the state court's denial of his claim was objectively unreasonable.

Petitioner has failed to demonstrate that expert testimony regarding the bullet trajectories was available.  Rather, petitioner offers only his theory, based upon his construction the facts - that it was impossible for the crime to have occurred as the state contended because the bullet trajectories did not match the relative positions of the two vehicles when petitioner allegedly fired his shotgun.  The facts petitioner uses to support his theory are questionable at best.  The only testimony concerning trajectories was by the medical examiner.  He stated that he recovered six shots from Ms. Horne's face and neck, and that there were two exit wounds, indicating that

two shots had passed through her (ex. S, pp. 454-456, 462-463).   A witness who arrived at the scene immediately after the murder testified that there was a hole in the passenger side window "behind the front . . . at an angle."  (Ex. S, p. 423-424). Based on this, petitioner posits that the shot could not have been fired from opposite Ms. Horne's car, but from some angle in front of it.  He then says that this proves that the shot had to have been fired out the back window of a vehicle, and that the photographs in evidence showed that his truck had a fixed rear window.

While petitioner presents an interesting theory, it is easily contradicted by the fact that the murder weapon was a shotgun loaded with No. 1 buckshot; that at least two shots passed through Ms. Horne's face or neck; that it was unknown how many shots were in the shell that was fired; and that any one of an unknown number of shots could have been deflected toward the rear as they exited Ms. Horne's body, or ricocheted back sufficiently to put a hole in the rear passenger window. Petitioner's construction of the facts proves very little.  While the evidence was circumstantial, it pointed directly at petitioner having the motive to kill Ms. Horne, at his being present in the area where the murder occurred, and at his having disposed of a prized shotgun (given to him by his father) by selling it to some unknown person for cash in another town, when the evidence also showed that he had earlier proclaimed that he would not sell his shotgun for a farm in Georgia.

Thus, while it can be argued that the hole in the rear passenger side window may have provided petitioner an opening on a possible defense, and that his counsel's performance was deficient in not pursuing it (which this court does not find), that does not afford petitioner relief here.   Although the evidence against petitioner was not overwhelming, petitioner has failed to establish a reasonable probability that if defense counsel had pursued petitioner's construction of the facts with some type of expert or additional argument to the jury, the result of the trial would have been different.   And as petitioner has failed to satisfy the prejudice prong of the *Strickland* standard, the state court decision denying his claim was not

unreasonable.  Therefore, petitioner is not entitled to federal habeas relief on this claim.

> 2.      **Ineffective assistance of counsel - failure to investigate biological evidence.**

As his second claim, petitioner contends that his trial counsel should have investigated the possibility that there were two blood types found in the victim's vehicle (doc. 22, pp. 4, 4d).

The Rule 3.850 court rejected this claim on the ground that petitioner failed to establish that his counsel's performance was deficient (ex. P, pp. 73-74).  The state court found that the only suggestion of evidence of "foreign blood" in the victim's van was in a question posed by defense counsel to a Ms. Ann Benner, a crime scene analyst, during a pre-trial deposition in which defense counsel stated, "there's a lab report in this case that indicates the presence of two different types of blood in the van." (*id*.).  The state court further found that defense counsel asked Ms. Benner and Ms. Sherry Feely, another analyst, whether they were aware of the presence of foreign blood in the van, and both analysts answered in the negative (*id*., p. 74).  The state court concluded that because there was no evidence that two blood types were found in the vehicle, petitioner failed to establish that his counsel was deficient in failing to further investigate the issue (ex. P, p. 74).

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence, therefore, the factual findings are presumed correct.  In the absence of any evidence of foreign blood in the victim's vehicle, petitioner cannot establish that his counsel performed deficiently by failing to further investigate this issue, or that a reasonable probability exists that the result of the trial would have been different if counsel had conducted further investigation.  Therefore, the state court's denial of petitioner's claim was not unreasonable.

> 3.      **Ineffective assistance of counsel - failure to investigate and present alternative theory.**

Next petitioner argues that Ms. Horne's daughters had a motive to kill her because they were experiencing financial problems and were beneficiaries of a life insurance policy, and that counsel failed to develop this as a defense theory (doc. 22, pp. 5, 5a-5c).  Petitioner states that one of the daughters had borrowed money from him and was delinquent in rental payments owed to him (*id.*, 5b).  Petitioner argues that this theory was additionally supported by his theory concerning the angle of the shotgun blast and that it would have taken two people to kill Ms. Horne - one to drive and one to shoot.

The Rule 3.850 court rejected petitioner's claim on the ground that the record established that defense counsel did elicit testimony concerning the insurance policy from one of Ms. Horne's daughters (ex. P, p. 74).

The trial transcript confirms that petitioner's counsel elicited testimony from Jeanie Singleton, Ms. Horne's daughter, that she and her sister received approximately $24,000.00 each from Ms. Horne's life insurance policy as a result of her death (ex. S, p. 636).  Additionally, Ms. Singleton testified, upon questioning by defense counsel, that she and her husband rented a house from petitioner from October of 1995 to the end of February, 1997, just two months prior to the murder (ex. S, p. 190).  In February of 1997, petitioner gave them a notice to vacate the premises (*id.*, pp. 190-91).  Ms. Singleton testified that she and her husband moved in with her mother for approximately one month while they attempted to finance a lot on which they could place a trailer (*id.*, p. 212).  She also testified that petitioner gave a negative report to a credit company who inquired about her and her husband's rental history (*id.*, p. 194).  Indeed, Petitioner testified that a "finance company" inquired of him regarding Ms. Singleton's rent history, and he told them that she always paid late, and she had fallen behind on payments at one time, but caught up (*id.*, pp. 856-67).

In light of this testimony, the jury was aware that Ms. Horne's daughters benefitted from her life insurance policy, and that one of her daughters was

experiencing financial difficulties in the months preceding the murder.  The only additional evidence of the family's financial problems identified by Petitioner is the fact that Ms. Singleton owed him money.  However, petitioner has failed to establish a reasonable probability that the result of the trial would have been different if defense counsel had presented this bit of evidence.  Therefore, the state court's denial of this claim was not unreasonable.  Accordingly, petitioner is not entitled to habeas relief.

4. **Ineffective assistance of counsel - failure to investigate statements by Charles Hawks.**

Petitioner next contends that defense counsel should have developed a theory of defense based on the claim that Mr. Charles Hawks came forward as an eyewitness to the shooting, stating that a black man was the assailant (petitioner is white), but later recanted (doc. 22, pp. 5, 5d).  Petitioner alleges Mr. Hawks recanted due to intimidation from law enforcement, specifically, Deputy Sanderson, and "coaching" from Mr. Hawks' sister.

The Rule 3.850 court held that petitioner failed to demonstrate prejudice because he failed to demonstrate that counsel's failure to present Mr. Hawk's recanted statement was "'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" (ex. P, p. 75 (quoting *Strickland*)).

At petitioner's trial, Deputy Sanderson testified that Mr. Hawks gave him inconsistent statements.  First he told the deputy that he had seen the shooting and that a black man had done it.  He later recanted and said he saw nothing.  Deputy Sanderson was fully cross-examined on this issue (ex. S, pp. 478-562).  Mr. Hawks did not testify, and petitioner contends that his testimony was crucial.  However, besides petitioner's speculation that Deputy Sanderson or Mr. Hawks' sister pressured Hawks into recanting his original version so that law enforcement could focus on petitioner, petitioner has produced nothing to show that Hawks' testimony, if presented at trial, would have changed the outcome.  The best petitioner could hope for would have been for Hawks to recant yet again and say a black man killed

Ms. Horne, but a reasonable jury would not have given much credit to such a witness, particularly where petitioner's motive and opportunity were so thoroughly proven.

Petitioner has failed to establish that his counsel's failure to investigate Mr. Hawks' statements or produce him or his sister as a witness at trial was unreasonable. Additionally, petitioner has failed to demonstrate a reasonable probability that the result of the trial would have been different if counsel had presented testimony from Mr. Hawks and/or his sister. Therefore, the state court's denial of this claim was not an unreasonable application of *Strickland*.

     5.   Ineffective assistance of counsel - failure to investigate statements by Jerry Gunn.

Next petitioner claims that counsel was ineffective for failing to present to the jury the fact that on the day of the murder, Jerry Gunn noticed a red car with a white male with a beard, in his 60's, sitting on a dirt road just off Highway 97 near the murder scene (doc. 22, pp. 5e-5f). Petitioner also argues that defense counsel should have interviewed Mr. Stuckey regarding whether he also saw a red car in the area (as previously noted, Mr. Stuckey testified that he and his family drove up behind the van as it was moving slowly and swerving; he also testified that he was driving a red MG at the time). Petitioner states the physical description of the old man is "strikingly similar" to Boyd Sigafoose, a wealthy married man with whom the victim was having an affair (doc. 22, p. 5f).

The Rule 3.850 court found that defense counsel did question Mr. Gunn at trial about the red car and its occupant (ex. P, p. 75-76). The state court concluded that because the information petitioner claimed was not brought to the jury's attention was in fact brought to the jury's attention, petitioner failed to demonstrate that counsel performed deficiently or that he was prejudiced by counsel's alleged error (*id.*, p. 76).

The state court's finding is fully supported by the trial transcript (ex. S, pp. 404-406). Defense counsel elicited testimony from Jerry Gunn that he noticed a red

car with a white male with a beard, in his 60's, sitting on a dirt road just off Highway 97 near the murder scene.  Additionally, the trial transcript shows that defense counsel questioned Mr. Stuckey about his recollection that he saw no other vehicles ahead of him or the van, no other vehicles pass him, and no other vehicles pass on the other side of the road, except the truck that was driving very fast (ex. S, pp. 429-30, 432-34).  Defense counsel also extensively questioned Mr. Sigapoose at trial about his relationship with Ms. Horne and whether he drove a red car (he testified that he did not) (ex. S, pp. 718-736).

The state court record directly refutes Petitioner's assertions that defense counsel failed to present Mr. Gunn's sighting of the man in the red car, failed to question Mr. Stuckey regarding his recollection of seeing other vehicles on the road, and failed to present evidence of Mr. Sigapoose's relationship with the victim and ownership of a red car.  Therefore, petitioner failed to establish that his counsel performed deficiently in this regard.  Furthermore, he has failed to demonstrate a reasonable probability that any further exploration of this issue by counsel would have resulted in a different outcome at trial.  Therefore, the state court's denial of his claim was reasonable.

   6.   Ineffective assistance of counsel - failure to investigate facts concerning Boyd Sigafoose.

In a related claim, petitioner contends that defense counsel provided ineffective assistance by failing to present to the jury the fact that Boyd Sigafoose was having an affair with Ms. Horne, and had a motive to kill her - so his wife would not find out (doc. 22, pp. 5g-5i).  Petitioner contends that if the jury had been apprised of this fact, Mr. Sigafoose would have been a more likely suspect than petitioner.

The Rule 3.850 court rejected this claim as being refuted by the record because defense counsel did call Mr. Sigafoose as a witness, Mr. Sigafoose admitted to the affair, and counsel argued to the jury that Mr. Sigafoose was the murderer (ex. P, p. 76).

The state court's finding is supported by the record (ex. S, pp,718-737, 999, 1003-1004).  Defense counsel pursued the "Mr. Sigafoose as murderer" theory, and Petitioner's belief that counsel could have performed better in investigating and presenting this theory is pure speculation and clearly insufficient to satisfy either the deficient performance or prejudice prong of the *Strickland* standard.  Therefore, the state court's denial of his claim was not an unreasonable application of clearly established Federal law.  Accordingly, Petitioner is not entitled to federal habeas relief.

 7. <u>Unlawful arrest in violation of the Uniform Criminal Extradition Act.</u>

 As his final claim, petitioner contends that he was arrested in Alabama by Florida law enforcement without a warrant and was not properly extradited to Florida to stand trial (doc. 22, p. 5i).  Respondent contends that this claim was not fairly presented to the state courts because petitioner presented it in his state habeas petition instead of his Rule 3.850 motion, which was the appropriate procedural vehicle.  Relying on *Baker, supra*, and Rule 3.850(h), respondent contends that Florida law provides that challenges to jurisdiction must be made in a motion for post-conviction relief pursuant to Rule 3.850, not a habeas petition.  Respondent concedes that *Baker* was decided after petitioner filed his state habeas petition, but respondent contends that the law cited in *Baker* and Rule 3.850(h) was well-established long before petitioner filed his state habeas petition.  Respondent contends that petitioner did not properly present his claim to the state courts, and the Rule's two year limitation period prevents him from doing so now (*see* Rule 3.850(b)).  Consequently, the issue is procedurally defaulted and cannot be considered by this court.

 Regardless of whether petitioner exhausted this claim in the state courts, this court concludes that the claim is without merit.  *See* 28 U.S.C. § 2254(b)(2) (the district court may deny a habeas petition on the merits, notwithstanding the failure of the petitioner to exhaust state court remedies).  The Supreme Court has held that

federal habeas corpus relief is not available on the ground that the petitioner was extradited in violation of his or her federally protected rights, even where the extradition itself was illegal. *See United States v. Alvarez-Machain*, 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (denying habeas corpus relief and holding that a trial court is not divested of jurisdiction where a person is abducted from Mexico and brought to the United States for trial in violation of an extradition treaty); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 76 L.Ed. 541 (1952) (denying habeas corpus relief and holding that there is no due process violation of lack of jurisdiction where a defendant is abducted in one state and taken to another for trial, even where the abduction violates the Federal Kidnapping Act); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) (denying habeas corpus relief and holding that there is no lack of jurisdiction even where defendant was forcibly abducted); *see also Hardin v. Pataki*, 320 F.3d 1289, 1299 (11th Cir. 2003) (because habeas corpus relief is not available to a person extradited in violation of his or her federally protected rights, even where the extradition itself was illegal, relief through 42 U.S.C. § 1983 must be available). Therefore, petitioner's is not entitled to habeas relief on his claim.

## CONCLUSION

Petitioner has failed to show that the state court's decisions on his ineffective assistance of counsel claims were "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d) (1); *Williams, supra*. Additionally, his jurisdictional claim on his alleged wrongful arrest in Alabama and prosecution in Florida is without merit. Therefore, petitioner is not entitled to issuance of the writ on any of the grounds raised in his habeas petition.

Accordingly, it is respectfully RECOMMENDED that the Title 28 U.S.C. § 2254 amended petition for writ of habeas corpus (doc. 22), challenging the conviction and sentence in *State of Florida v. Clark Bartholomere Wilson* in the Circuit Court of Escambia County, Florida, case no. 97-2496, be DENIED, and that this cause be DISMISSED and the clerk be directed to close the file.

At Pensacola, Florida, this 20th day of July, 2006.


/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).